UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**LIQUIDATION TRUSTEE,**

        Appellant,     1:10-CV-321

   -v-

**DONALD and LISA BRENNER,**

        Respondents.

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**FARM CREDIT EAST, ACA, formerly known as
FIRST PIONEER FARM CREDIT, ACA,**

        Appellant,

   -v-           1:10-CV-322

**DONALD L. BRENNER and LISA R.BRENNER,**

        Respondents.

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

In re:                  Chapter 11

  **LINCOLN LOGS LTD.,**       Bankr. Case No. 08-13079

        Debtor(s).     (Jointly Administered)

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

In re:                  Chapter 11

  **SNAKE RIVER LOG HOMES, LLC,**  Bankr. Case No. 08-13080

        Debtor(s).

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Nolan & Heller, LLP
Justin A. Heller, Esq., of counsel
39 North Pearl Street
Albany, New York 12203
Attorney for Liquidation Trustee, Appellant in 1:10-CV-321

Harris Beach PLLC
Kelly C. Griffith, Esq., of counsel
300 South State Street, One Park Place
Syracuse, New York 13202
Attorney for Farm Credit East, ACA, Appellant in 1:10-CV-322

Office of Robert J. Rock
Robert J. Rock, Esq., of counsel
60 South Swan Street
Albany, New York 12210
Attorney for Donald L. Brenner and Lisa R. Brenner, Respondents in Both Appeals

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

This appeal stems from a proceeding filed by the debtor, Lincoln Logs, Ltd. ("Lincoln Logs") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq*. *In re Lincoln Logs Ltd.*, Bankr. Case No. 08-13079. On July 3, 2006, respondents, Donald L. Brenner and Lisa R. Brenner ("Brenners"), contracted with Lincoln Logs to purchase materials and plans for a log cabin home. On September 19, 2008, after the Brenners made payment in full, but before delivering all the materials, Lincoln Logs filed for bankruptcy. On April 21, 2009, the Brenners moved in bankruptcy court for turnover of the undelivered materials, or, in the alternative, for a refund of the monies paid for the undelivered materials. In a Memorandum-Decision and Order dated January 25, 2010, Chief United States Bankruptcy Judge Robert E. Littlefield, Jr. held that by operation of New York law, the Brenners' payment to Lincoln Logs was subject to a statutory trust and not part of the bankruptcy estate. *See generally Clancy v. Goldberg*, 183 B.R. 672, 676-

77 (N.D.N.Y. 1995). Accordingly, Chief Judge Littlefield granted the April 21, 2009 motion, directed payment to the Brenners for the value of the undelivered goods purchased from Lincoln Logs, and ordered further proceedings to determine the value. *In re Lincoln Logs Ltd.*, 2010 WL 322163 (Bankr. N.D.N.Y. January 25, 2010). The Liquidation Trustee and a creditor, Farm Credit East, ACA (together, "appellants") appeal, arguing that Chief Judge Littlefield erred in imposing a statutory trust and directing payment to the Brenners for the value of the undelivered goods. As explained below, the Court reverses the January 25, 2010 Order and remands the matter to bankruptcy court for whatever further action may be appropriate.

## BACKGROUND

The Court adopts Chief Judge Littlefield's recitation of the facts, set forth here for the reader's convenience:

> Lincoln Logs was a log home manufacturer headquartered in Chestertown, New York. It was distinguished by its variety of solid log profiles and sizes, panelized wall systems, abundant standard designs, custom plans, engineering services, and national sales network. Prior to the closing of its sales office in April 2008, Lincoln Logs' wholly-owned subsidiary Snake River Log Homes, LLC ("Snake River") produced pre-packaged log homes in the Swedish Cope style (a style of log home prevalent on the west coast). Snake River has ceased operating. On September 19, 2008, Lincoln Logs and Snake River (collectively, the "Debtors") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code. The cases are being jointly administered pursuant to the Order for Joint Administration entered on September 22, 2008. The Debtors filed a Chapter 11 Joint Plan of Liquidation on March 5, 2009 and an Amended Chapter 11 Joint Plan of Liquidation on May 4, 2009. By order dated July 20, 2009, the Amended Chapter 11 Joint Plan of Liquidation (the "Plan" ) was confirmed, and a liquidating trust was formed with Justin A. Heller, Esq. ("Liquidation Trustee") appointed as trustee thereof. The Plan provides for an absolute priority distribution to holders of claims against the Debtors.
>
> Prior to the petition date, on July 3, 2006, the Brenners entered into a purchase agreement ("Purchase Agreement") with Lincoln Logs for the purchase of a Custom Chalet log home ("Custom Chalet"). The Purchase

Agreement sets forth the specifications for the Custom Chalet by way of handwritten notes and checkmarks. For example, a blank space appears next to the typewritten words "Standard Design" whereas the handwritten inscription "Custom Chalet" appears next to the typewritten words "Custom Design." Similarly, handwritten notes set the "Dimensions" of the Custom Chalet as "58 x 36'," the "Log Size" as "8"," and the "Shingle Color" as "T.B.D." For the respective categories of "Wood Species," "Wall System," and "Profile," checkmarks appear in the boxes next to the words "Pine," "Log," and "D-Log" while blank boxes appear next to the words "Cedar," "Thermo-Home," "Lincoln Panel," "Round/Round," "4" WB," "8" WB," "Swedish Cope," and "Other." Handwritten notes in the "Options/ Upgrades" section of the Purchase Agreement call for a "58 x 10 Cedar Deck" and indicate that the purchase price "Includes 1st FL system w/ Advantec." Finally, the Windows & Doors Addendum to the Purchase Agreement details the number, style, and models of the individually selected "Vetter HiPro 4 windows (Clad Color T.B.D.)" along with the number, style, size, and models of the individually selected doors. For both the windows and doors, the column for "Total Retail Price" is blank.

The Purchase Agreement was amended seven times through sales agreement amendment forms. The seventh and final amendment form, dated August 27, 2008, substituted BiltBest (black clad) brand windows for the previously selected Vetter brand windows and set the final purchase price of the Custom Chalet at $111,008.88. Pursuant to the Purchase Agreement and amendments, Lincoln Logs was to deliver the Custom Chalet to the Brenners' property located on Hurds Road in Ulster County.

The Brenners paid for the Custom Chalet in full. The Purchase Agreement payment schedule provides for a 10 percent deposit, a 40 percent "Pre-cutting Payment," with the 50 percent balance to be paid by certified check. The Brenners made corresponding payments in the amounts of $ 11,454.48, $44,248.68, and $55,305.72 for a total of $111,008.88. The Brenners' additional payment of $1,630.11 on August 7, 2009 apparently corresponds with the freight charges in the Purchase Agreement. Lincoln Logs has delivered certain portions of the Brenners' Custom Chalet. The present dispute arises from its failure to deliver remaining portions of the Custom Chalet, namely, siding, windows, doors, and interior tongue and groove boards.

On January 20, 2009, the Brenners timely filed a proof of claim asserting their rights to the undelivered goods or, in the alternative, to repayment in the amount of the value of such goods. The original proof of claim lists the Brenners' claim as a secured claim in the amount of $167,944.71. The Brenners filed an amended proof of claim on November 20, 2009, changing

-4-

>the secured claimed amount from $167,944.71 to $55,000, representing the alleged value of the undelivered portions of the Custom Chalet.
>
>On April 21, 2009, the Brenners filed the instant omnibus motion seeking turnover of the undelivered goods and other relief. The motion was opposed by First Pioneer [Farm Credit East, ACA], a secured creditor with a security interest in all of Lincoln Logs' tangible and intangible personal property, the Creditors' Committee, and the Debtors. ***

(Footnotes and citations to record omitted.)

Chief Judge Littlefield held that the Purchase Agreement between the Brenners and Lincoln Logs is a "home improvement contract" under section 770(6) of New York General Business Law ("GBL"), and that therefore New York law required Lincoln Logs to hold the payments in an escrow account, where they would remain the property of the Brenners until substantial completion of the contract. *See* GBL § 771(1)(e); N.Y. Lien Law § 71-a(4)(a),(d). Chief Judge Littlefield thus concluded that so much of the Brenners' payment as was attributable to the undelivered materials was subject to a statutory trust and did not constitute estate property distributable under 11 U.S.C. § 541(a)(1).[1]

Appellants do not dispute Chief Judge Littlefield's factual findings. Rather, they contend that the Purchase Agreement between the Brenners and Lincoln Logs is a contract for the sale of goods, not a home improvement contract under GBL § 770(6). Thus, they argue, there is no basis to impose a statutory trust, and the funds are property of the estate. This Court agrees with appellants and reverses the January 25, 2010 Order.

**STANDARD OF REVIEW**

A district court may not overturn a bankruptcy court's findings of fact unless they are

---

[1] Chief Judge Littlefield did not reach the Brenners's alternative argument for a constructive trust.

clearly erroneous.  *See* Fed. R. Bankr. P. 8013.  Its conclusions of law are reviewed *de novo*.  *See In re Manville Forest Prods. Corp.*, 209 F.3d 125,128 (2d Cir. 2000).  Where the material facts are not in dispute, the decision is reviewed *de novo*.  *See id.*  A bankruptcy court's decision whether to exercise its discretion is reviewed for abuse of discretion.  *See In re Flanagan*, 503 F.3d 171, 179-80 (2d Cir. 2007).

## THE STATUTE

At issue here is whether the Purchase Agreement is a home improvement contract subject to GBL Article 36-A, §§ 770-776.  Section 770, set forth in full below, defines the terms used throughout Article 36-A.  If the Purchase Agreement is a home improvement contract as defined in section 770(6), it must contain certain contract provisions required by section 771.  One such provision is a notification that "the home improvement contractor is legally required to deposit all payments received prior to completion in accordance with subdivision four of section seventy-one-a of the lien law[.]"  GBL § 771(1)(e).  The cited section of the Lien Law requires the home improvement contractor to hold the owner's advance payments in an escrow account, where they remain the property of the owner until substantial performance of the contract.  N.Y. Lien Law § 71-a(4)(a),(d)(iii).

Section 770 reads as follows:

> As used in this article, the following terms, unless the context requires otherwise, shall have the following meanings:
>
> 1. "Person" means a natural person.
>
> 2. "Owner" means any homeowner, co-operative shareholder owner, or residential tenant, or any person who purchases a custom home as defined in this section.
>
> 3. "Home improvement" means the repairing, remodeling, altering,

converting, or modernizing of, or adding to, residential property and shall include, but not be limited to, the construction, erection, replacement, or improvement of driveways, swimming pools, siding, insulation, roofing, windows, terraces, patios, landscaping, fences, porches, garages, solar energy systems, flooring, basements, and other improvements of the residential property and all structures or land adjacent to it. "Home improvement" shall also mean the construction of a custom home, the installation of home improvement goods or the furnishing of home improvement services. "Home improvement" shall not include:

> (a) the sale or construction of a new home, other than a custom home as defined in this section;
> (b) the sale of goods by a seller who neither arranges to perform nor performs, directly or indirectly, any work or labor in connection with the installation or application of the goods;
> (c) the sale or installation of appliances, such as stoves, refrigerators, freezers, room air conditioners, dishwashers, clothes washers or dryers, which are designed to be removable from the premises without material alteration thereof;
> (d) the sale or installation of decorative goods or services, such as draperies and carpets; or
> (e) the performance of repairs, replacements, or other services pursuant to an express or implied warranty, or a maintenance agreement as defined in section three hundred ninety-five-a of this chapter.

4. "Home improvement goods or services" means goods and services which are bought in connection with home improvement. Such home improvement goods and services include burglar alarms, texture coating, fencing, air conditioning, heating equipment, and any other goods which, at the time of sale or subsequently, are to be so affixed to real property by the home improvement contractor as to become a part of real property whether or not severable therefrom.

5. "Home improvement contractor" means a person, firm or corporation which owns or operates a home improvement business or who undertakes, offers to undertake or agrees to perform any home improvement for a fee and for whom the total cash price of all of his home improvement contracts with all his customers exceeds one thousand five hundred dollars during any period of twelve consecutive months. Home improvement contractor does not include a person, firm, corporation, landlord, cooperative corporation, condominium board of managers, joint tenant or co-tenant that owns, in whole or in part, the property to be improved.

6. "Home improvement contract" means an agreement for the performance

of home improvement, between a home improvement contractor and an owner, and where the aggregate contract price specified in one or more home improvement contracts, including all labor, services and materials to be furnished by the home improvement contractor, exceeds five hundred dollars.

7. "Custom home" means a new single family residence to be constructed on premises owned of record by the purchaser at the time of contract, provided that such residence is intended for residential occupancy by such purchaser and the contract of sale is entered into on or after the first day of March, nineteen hundred ninety.

## DISCUSSION

The pertinent facts are not in issue. The question before the Court is whether the Purchase Agreement between the Brenners and Lincoln Logs is a "home improvement contract" within the meaning of GBL § 770(6). Chief Judge Littlefield found that it was. He concluded that, by operation of GBL § 771(1)(e) and N.Y. Lien Law § 71-a(4)(a) and (d), the Brenners' payments were held by Lincoln Logs in trust and thus were not distributable as property of the bankruptcy estate. Because the issue involves the application of the law to undisputed facts, this Court conducts a *de novo* review.

The Purchase Agreement, dated July 3, 2003, is for a "Basic Home Package" for a "Custom Chalet." It includes a floor plan and specifies the type of wood, wall system, deck, window models, and door models. The Purchase Agreement states: "Package Price includes Aluminum Clad windows & sliding doors, insulated entry door with full sidelight, 16' shed dormer, complete roof system, interior partitions (studded only)." It continues: "Price does not include package construction, delivery or unloading fees, sales tax, fixed glass, fireplace, or interior finishing."

On the same date, the Brenners also signed a "Construction Liability Disclaimer", which

states in part:

> The Purchaser understands that the Purchase Agreement entered into between the Purchaser and Lincoln Logs Ltd. relates solely to the sale of the home, solarium package and/or building materials from Lincoln Logs Ltd. and not in any manner to its construction.
>
> \*\*\*
>
> It is further understood and agreed that any referral of a contractor by a Dealer is done as a courtesy to the Purchaser. A Dealer's recommendation, testimonial, or comments about a contractor is beyond the scope of the Purchase Agreement and is done so independently of Lincoln Logs Ltd. and without its endorsement or authority.
>
> It is likewise understood and agreed that when the Purchaser hires a contractor to perform any construction related services with the log home package from Lincoln Logs Ltd., that any and all work by that contractor is performed independently of Lincoln Logs Ltd. and its Dealer. Consequently, the Purchaser shall look solely to the contractor to satisfy any and all claims related to any construction related services.

For the reasons set forth below, the Court finds that this Purchase Agreement – in which the Brenners purchased from Lincoln Logs a building plan and materials for a home to be constructed by a contractor who was to be hired by the Brenners and who had no connection to Lincoln Logs – is not a home improvement contract within the meaning of section 770.

In construing a statute, a court "begins with the plain language of the statute," which it considers in "the specific context in which that language is used, and the broader context of the statute as a whole." *In re Ames Dept. Stores, Inc*., 582 F.3d 422, 427 (2d Cir. 2009) (citations omitted). A court may properly turn to the legislative history only when "the plain statutory language is ambiguous or would lead to an absurd result." *Id.* (citation omitted).

A reading of the plain language of section 770 establishes that it does not cover the Purchase Agreement entered into between the Brenners and Lincoln Logs. The Purchase Agreement is not a "home improvement contract", defined by subdivision 6 as "an agreement for

the performance of home improvement, between a home improvement contractor and an owner[.]" (Emphasis added.) Lincoln Logs did not undertake to "perform" a home improvement of any kind; it simply agreed to sell materials. That the materials may have been fabricated to the Brenners' specifications or to conform to plans drawn for the Brenners by Lincoln Logs does not transform this transaction from a sale of goods into the performance of a home improvement.

Moreover, the Purchase Agreement is not an agreement "between a home improvement contractor and an owner" under subdivision 6, because Lincoln Logs was not a home improvement contractor. Subdivision 5 defines a "home improvement contractor" as either "a person, firm or corporation which owns or operates a home improvement business" or one "who undertakes, offers to undertake or agrees to perform any home improvement for a fee[.]" (Emphasis added.) Lincoln Logs did not own or operate a home improvement business, because, as will be seen below, the sale of home improvement materials, without more, is not "home improvement" within the statute. Nor did Lincoln Logs undertake or agree to "perform" a home improvement for the Brenners when it agreed to furnish materials to them.

"Home improvement" is defined in the first two sentences of subdivision 3, as follows:

> "Home improvement" means the repairing, remodeling, altering, converting, or modernizing of, or adding to, residential property and shall include, but not be limited to, the construction, erection, replacement, or improvement of driveways, swimming pools, siding, insulation, roofing, windows, terraces, patios, landscaping, fences, porches, garages, solar energy systems, flooring, basements, and other improvements of the residential property and all structures or land adjacent to it. "Home improvement" shall also mean the construction of a custom home, the installation of home improvement goods or the furnishing of home improvement services.

Subdivision 3 makes clear that "home improvement" contemplates the performance of work or labor in improving an existing home or constructing a new custom home. The first sentence of

-10-

subdivision 3 defines home improvement as "repairing, remodeling, altering, converting, or modernizing of, or adding to", all of which contemplate the performance of construction activities. The first sentence also states that home improvement includes "construction, erection, replacement, or improvement" of various features of a home – again, all of these are activities to be performed, not goods. The second sentence of subdivision 3 provides that home improvement "shall also mean the <u>construction</u> of a custom home, the <u>installation</u> of home improvement goods or the <u>furnishing</u> of home improvement <u>services</u>." (Emphasis added.) [2] Construction, installation, and furnishing services all involve the performance of work or labor – not merely the provision of materials or other goods.

This Court's reading of the term "home improvement" as requiring the performance of work or labor in connection with any materials purchased is also supported by subdivision 3(b), which expressly excludes from the definition of home improvement "the sale of goods by a seller who <u>neither</u> <u>arranges</u> <u>to</u> <u>perform</u> <u>nor</u> <u>performs</u>, directly or indirectly, any <u>work</u> <u>or</u> <u>labor</u> in connection with the installation or application of the goods." This is consistent with subdivision 4's definition of "home improvement goods or services" as "goods and services which are bought in connection with home improvement" and which "are to be ... <u>affixed</u> to real property <u>by</u> <u>the</u> <u>home</u> <u>improvement</u> <u>contractor</u>[.]" (Emphasis added.).

In sum, GBL § 770 consistently uses the term "home improvement" to contemplate the

---

[2] The Brenners argue that the package of materials and plans they purchased may be considered a "custom home". Subdivision 7 defines "custom home" as "a new single family residence to be constructed on premises owned of record by the purchaser[.]" Arguably, then, the package that the Brenners purchased from Lincoln Logs was a new residence "to be constructed" on their land. Nevertheless, the Purchase Agreement was not for "<u>construction</u> of a custom home" (emphasis added), and thus was not for a home improvement under subdivision (3).

performance of work or labor in connection with any purchase of goods or materials. A contract for the sale of building materials by an entity such as Lincoln Logs that did not perform or arrange to perform any work or labor in connection with the construction or installation of the materials is not a "home improvement contract" under the statute.[3] The Court finds nothing in section 770 to support applying the protections of GBL § 771(1)(e) and N.Y. Lien Law § 71-a(4)(a) and (d) to the Purchase Agreement in issue here.

On *de novo* review, the Court concludes that the Purchase Agreement between the Brenners and Lincoln Logs is not a home improvement contract subject to GBL Article 36-A and that the monies paid by the Brenners to Lincoln Logs for undelivered materials are not subject to a statutory trust. Accordingly, the January 25, 2010 order is reversed.

## CONSTRUCTIVE TRUST

Chief Judge Littlefield did not reach the Brenners' alternative argument that a constructive trust should be imposed on the estate in the amount attributable to the undelivered goods. The doctrine of constructive trust is an equitable doctrine to be applied "with sufficient flexibility to prevent unjust enrichment in a wide range of circumstances." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 353-54 (2d Cir. 1992). The doctrine must be applied cautiously in the context of a bankruptcy proceeding, because "the constructive trust doctrine can wreak ... havoc with the

---

[3] This conclusion is also supported by GBL § 771, "Contract provisions." Section 771 clearly concerns contracts for the performance of work and for the sale of materials incidental to that work – not merely the sale of materials. For example, it requires the contract to set forth the approximate dates "when the work will begin and be substantially completed," GBL § 771(1)(b); to describe "the work to be performed [and] the materials to be provided to the owner," GBL § 771(1)(c); and to set forth specified information if the contract provides for progress payments to be made prior to substantial completion of the work. GBL § 771(1)(f). Further, it refers to a provider of "home improvement goods or services" as a "materialman" as distinct from a contractor. GBL § 771(1)(d).

priority system ordained by the Bankruptcy Code." *In re Haber Oil Co.*, 12 F.3d 426, 436 (5th Cir. 1994) (quoted in *In re First Cent. Fin. Corp.*, 377 F.3d 209, 217 (2d Cir. 2004)). Chief Judge Littlefield is in the best position to consider the equities of the Brenners' situation and balance them with the realities of this bankruptcy proceeding in particular and the goals of the Bankruptcy Code in general. His exercise of discretion would be reviewable by this Court only for abuse of discretion. *See In re Flanagan*, 503 F.3d 171, 179-80 (2d Cir. 2007). Therefore, this Court does not address the constructive trust issue but rather remands the case for whatever further action may be appropriate.

## CONCLUSION

It is therefore

ORDERED that the January 25, 2010 Order of Chief United States Bankruptcy Judge Littlefield is reversed; and it is further

ORDERED that matter is remanded to bankruptcy court for whatever further action may be appropriate.

IT IS SO ORDERED.
September 23, 2010
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge